## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| WORLDPAY US, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 4179 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| IRINA HAYDON and EUNYT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Worldpay US, Inc. ("Worldpay") has brought this suit against defendant Irina Haydon, a former employee of Worldpay, and defendant Eunyt, LLC ("Eunyt"), a corporation formed by Ms. Haydon, alleging misappropriation of trade secrets and other contract and tort violations regarding Ms. Haydon's founding of Eunyt while still a Worldpay employee. Ms. Haydon has filed a counterclaim against Worldpay, alleging that her termination violated the anti-retaliation provisions of the False Claims Act and the Sarbanes-Oxley Act. Both parties have filed motions for summary judgment. For the following reasons, Worldpay's motion for partial summary judgment is granted, and the defendants' motion for summary judgment is granted in part and denied in part.

### BACKGROUND

Defendant Irina Haydon was employed as an executive vice president of sales at Worldpay, a company that operates as a payment processing service. *See* Compl. ¶ 1. Ms. Haydon had worked for Century Payments, Inc., beginning in September 2012 and transitioned to a role with Worldpay when Worldpay acquired Century in 2013 and merged with it in 2014. Worldpay "acquired all of Century's trade secret, confidential, and proprietary business information and Worldpay became

Century's successor in interest with respect to Century's agreements with employees and customers." PSOF ¶¶ 2-4.[1]

As part of her offer of employment with Century, Ms. Haydon signed a Proprietary Information and Inventions Assignment Agreement. The Agreement states in part:

> except as expressly authorized in writing by the Company or as may otherwise be authorized by law or court order, I will not disclose Proprietary Information to any third party and will not use Proprietary Information for the benefit of anyone other than the Company. This prohibition includes, but is not limited to, use of Proprietary Information to solicit any of the Company's former, current or prospective clients, or to solicit or encourage any other entity to solicit for employment any other employee of the Company or its affiliates.

*Id.* ¶ 6. Proprietary information is broadly defined in the Agreement, to include technical and business information such as compensation and sales data, supplier and customer lists and information, and prices and costs, and information relating to Worldpay's future plans, including marketing strategies. *Id.* ¶ 7. The Agreement states that Ms. Haydon's obligations under the Agreement "will continue in effect indefinitely after termination of my employment, regardless of the reason or reasons for termination" and that her obligations "will inure to the benefit of the Company, its affiliates, and its and their respective subsidiaries, successors and assigns." *Id.* ¶ 9. The Agreement also contains a choice-of-law clause stating that the Agreement shall be governed by Texas law.[2] Worldpay avers that it takes "substantial efforts to protect" its proprietary information, including requiring all new employees to execute nondisclosure agreements,

---

[1] Because Defendants' Statement of Material Facts comprises just 26 paragraphs, facts are largely drawn from Plaintiff's Statement of Material Facts and are undisputed unless otherwise noted.

[2] The defendants have produced other, later agreements governed by Georgia law that were signed by other Worldpay employees, but they have not produced any other agreements, including any pertaining to proprietary information, executed by Ms. Haydon. *See* Pl.'s Resp. DSOF ¶ 5.

password-protecting and monitoring employees' access to proprietary information, and restricting employees' ability to download, copy, transfer, or email proprietary information. *Id.* ¶ 10.

Worldpay alleges that in November 2016, while still employed with Worldpay, Ms. Haydon began the process of setting up a separate company, Eunyt, LLC, which was incorporated in March 2017. *Id.* ¶¶ 17, 19. On March 30, 2017, Ms. Haydon met with several Worldpay employees in Fairview, Texas, to discuss the marketing and sales plan for Eunyt. The attendees were given a "New Hire Acknowledgement" form from Eunyt, which Ms. Haydon alleges, and Worldpay disputes, included a nondisclosure agreement that prohibited Eunyt employees from using other companies' confidential information. *See* Pl.'s Resp. DSOF ¶ 23. During the meeting, a handout was circulated that "listed Worldpay as a 'primary' competitor of Eunyt," PSOF ¶ 24; the parties dispute whether Ms. Haydon or another Eunyt employee created and circulated the handout. Defs.' Resp. PSOF ¶ 24. The parties also dispute whether Ms. Haydon was required to be in Fairview that day on Worldpay business, but Ms. Haydon does not dispute that she submitted her receipts for the trip to Worldpay for reimbursement. *Id.* ¶ 22.

Worldpay alleges that during the meeting, Ms. Haydon asked Worldpay employee Randy Standish to copy her Worldpay email account.[3] On April 6, 2017, Mr. Standish wrote an email to Ms. Haydon saying "I 'secretly' started the migration of your WP emails on Monday. This has now been completed and everything is in a separate eunyt email box . . . You have all the emails

---

[3] The defendants dispute various aspects of these allegations. According to the defendants, Ms. Haydon never contacted Mr. Standish directly to perform work for Eunyt, DSOF ¶ 11; the only work Mr. Standish performed for Eunyt was setting up a domain and email accounts for Eunyt, *id.* ¶ 12; and though Ms. Haydon asked Mr. Standish to create a backup of her Worldpay account, she never asked him to provide the email backup to Eunyt and, once he had done so, she instructed him to remove the email backup from Eunyt's server, *id.* ¶¶ 18-21. The defendants also allege that "[n]o one affiliated with Eunyt other than Ms. Haydon viewed the emails Mr. Standish copied." *Id.* ¶ 22.

up to April 3, 2017 . . . At the time of your termination with WP, I can get the remaining emails after that date if needed." PSOF ¶ 27. Ms. Haydon and Eunyt paid Mr. Standish for this work and for setting up Eunyt's web domain and email accounts. *Id.* ¶ 29.

In addition, Ms. Haydon forwarded emails from her Worldpay account to her personal Yahoo account, including pricing information, a customer's contract and tax information, a P&L spreadsheet, and "information regarding the financial split between Worldpay and its business partners." *Id.* ¶¶ 30-31. On April 10, 2017, Ms. Haydon sent an email to Matt Bott, a Eunyt employee, attaching Worldpay marketing materials and saying, "We will just swap out [Worldpay] logos for EUNYT when ready." *Id.* ¶ 32.

Worldpay asserts that on April 3, 2017, Ms. Haydon directed a potential business partner for Worldpay, CEB Sales, to her personal email address and began discussing a potential partnership between CEB Sales and Eunyt. *Id.* ¶ 33. Worldpay further maintains that "Haydon spoke with representatives from NCR and the San Diego Cash Register regarding her opening up a separate company and migrating their business from Worldpay to the company." Pl.'s Resp. DSOF ¶ 14. The defendants assert that CEB is a general consulting firm rather than a potential client and that, though there is no evidence that Worldpay intended to employ CEB's services, both Worldpay and Eunyt could have worked with CEB. Defs.' Resp. PSOF ¶ 33. Similarly, defendants state that the only Worldpay client Eunyt contacted was Zuzapp; however, they allege that contact was to engage Zuzapp as a vendor, rather than a customer. DSOF ¶¶ 14-15. The defendants aver that Eunyt did not obtain any clients while Ms. Haydon was employed with Worldpay. *Id.* ¶ 13.

Worldpay also alleges that Ms. Haydon engaged in a bonus-sharing scheme with one of her subordinates, Jeffrey Mandel.[4] Worldpay alleges that Ms. Haydon "manipulated Mandel's quarterly target for a bonus by lowering his target for account acquisitions to 112 . . . This new target was not represented in any Worldpay agreement with Mandel" and that she "later indicated that Mandel's target was not supposed to be reflected into her own target, which was codified in her agreement with Worldpay, even though all of her other subordinates' targets were so included." PSOF ¶¶ 37-39. Accordingly, Mr. Mandel became eligible for a $79,000 bonus. He transferred half of the net amount to Ms. Haydon; she allegedly complained that he had not transferred her half of the gross amount. *Id.* ¶¶ 39-40.

Ms. Haydon's counterclaim pertains to a "Rate Lock Guarantee" that, Ms. Haydon alleges, Worldpay had provided to various customers, including its government clients. Worldpay acknowledges that some of its marketing materials described a Rate Lock Guarantee that rates would not increase unless interchange rates from Visa and Mastercard increased. *Id.* ¶¶ 41-42. For most clients, references to the Rate Lock Guarantee were included in sales enablement documents, but there was no signed contract with Worldpay guaranteeing that rates would not increase absent interchange rate changes. *Id.* ¶ 49. The parties dispute whether this was true with respect to government clients. Defs.' Resp. PSOF ¶ 49; Pl.'s Resp. Defs.' Statement Add'l Facts ¶¶ 77, 79. Worldpay avers that interchange rates increased in April 2017 and, accordingly, it sent monthly charge statements to customers including a notice that financing charges would increase. PSOF

---

[4] The defendants dispute the facts related to Mr. Mandel, stating instead that toward "the end of Ms. Haydon's employment with Plaintiff, several of Ms. Haydon's employees received inaccurate pay," which she "worked diligently to help resolve." DSOF ¶¶ 24-25. The defendants further aver that there is "no context to the email [forwarding sales numbers from Mandel to Hartman], no indication that Ms. Haydon 'manipulated' any targets, and no indication that the target was not represented elsewhere in Mandell's targets." Defs.' Resp. PSOF ¶ 38.

¶¶ 41, 43. Worldpay alleges that Ms. Haydon complained about the increasing rates out of a concern that Worldpay would lose customers and negatively impact her subordinates' commissions. *Id.* ¶ 44.

On May 3, 2017, Worldpay employee Delroy McFarlane reported Ms. Haydon's activities with Eunyt to Worldpay CEO Kim Goodman and provided a recording of the March Fairview, Texas meeting and the documents circulated at the meeting. *Id.* ¶ 50. Worldpay alleges that the "recording also captured Haydon identifying several specific Worldpay customers whom she alleged were underserved by Worldpay and would be better served by Eunyt." *Id.* ¶ 52.[5] While the defendants dispute this contention, the transcript of the recording does indeed show that Ms. Haydon referred to specific Worldpay customers at the Fairview meeting. *See, e.g.*, TX Meeting Tr. 1 at 20:11-25; TX Meeting Tr. 2 at 83:6-19, ECF No. 152. Worldpay began an investigation on May 4 and fired Ms. Haydon in a letter dated May 11, 2017. Defs.' Resp. PSOF ¶¶ 54-55. The termination letter contained a directive to preserve all documents related to her involvement in the formation of Eunyt, including any activities undertaken with respect to Worldpay's customers and employees. Nevertheless, Ms. Haydon testified that she instructed Eunyt employee Hila Shpigelman to shut down the Eunyt email domain after her termination, in June 2017. Pl.'s Statement Add'l Facts ¶¶ 5-7, ECF No. 144. Worldpay also terminated Frank Fantuazzo, William Luyk, Jeffrey Sanders, Tyler Nowell, Randy Standish, and Alex Benjamin for their "involvement with Haydon in forming a competing business." PSOF ¶ 58.

---

[5] The parties also dispute whether the recording of the meeting supports the contention that Ms. Haydon intended to hire Bette Solis, a former Century representative then employed by Worldpay, so as to have access to "her 800 customers," or whether that portion of the recording is unintelligible. *See* Defs.' Resp. PSOF ¶ 51.

Worldpay filed this suit on June 1, 2017, alleging misappropriation of its trade secrets and other proprietary information, breach of the Proprietary Information Agreement, and various state law torts.[6] The defendants filed a counterclaim against Worldpay, alleging that Ms. Haydon's termination violated the False Claims Act and the Sarbanes-Oxley Act because it was done in retaliation for questioning the company's claim that increased fees charged to government customers were due to increased interchange fees. Worldpay filed a partial motion for summary judgment on its breach of contract claim and Ms. Haydon's counterclaims on March 5, 2019, ECF No. 118. The defendants filed a motion for summary judgment on all of Worldpay's claims and on Ms. Haydon's counterclaims on March 6, 2019, ECF No. 124.

## DISCUSSION

### I. Legal Standards

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, "[t]he nonmoving party must point to specific facts showing that there is a genuine issue for trial." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Factual disputes do "not preclude summary judgment when the dispute does not involve a material fact." *Burton v.*

---

[6] The complaint alleges violation of the federal Defense of Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and a number of theories grounded in state statutory and common law. Jurisdiction is premised on 28 U.S.C. § 1331 based on the DTSA and on the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as to the state law theories.

*Downey*, 805 F.3d 776, 783 (7th Cir. 2015). When considering the summary judgment materials, the Court must "construe all facts and draw all reasonable inferences in favor of the nonmoving party." *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011).

## II. Choice of Law

As an initial matter, Worldpay asserts, and the defendants dispute, that Worldpay's breach of contract claim is governed by Texas law. Illinois respects a contract's choice-of-law clause "as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy." *Fulcrum Fin. Partners v. Meridian Leasing Corp.*, 230 F.3d 1004, 1011 (7th Cir. 2000). Worldpay avers that the Proprietary Information and Inventions Assignment Agreement that Ms. Haydon signed when she was hired by Century in 2012 contains a Texas choice-of-law clause. The defendants have not contested the validity of the Agreement or its choice-of-law clause, and the choice-of-law clause does not contravene Illinois's public policy. *See, e.g.*, *Children's Surgical Found. v. Nat'l Data Corp.*, 121 F. Supp. 2d 1221, 1227 (N.D. Ill. 2000) (upholding Texas choice-of-law clause in agreement between employee and employer's predecessor).

The defendants argue, however, that the breach of contract claim should be governed by Georgia law because several other, later Worldpay agreements are governed by Georgia law.[7] This

---

[7] The parties' choice-of-law dispute seems to have more to do with the underlying contract than the governing state law: both Georgia and Texas have trade secrets acts that preempt other common law remedies based on misappropriation of trade secrets, *see* O.C.G.A. § 10-1-767(a); Tex. Civ. Prac. & Rem. Code § 134A.007(a). Both states, however, specifically exempt contractual claims, "whether or not based upon misappropriation of a trade secret," from this preemption. O.C.G.A. § 10-1-767(b)(1); Tex. Civ. Prac. & Rem. Code § 134A.007(b)(1). Similarly, both states are willing to uphold confidentiality agreements even in the absence of time limit or geographical restrictions. *See* O.C.G.A. § 10-1-767(b)(1) ("a contractual duty to maintain a trade secret or limit use of a trade secret shall not be deemed void or unenforceable solely for lack of a durational or geographical limitation on the duty"); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex. App. 1992) ("We find no Texas case requiring that enforceable nondisclosure covenants contain time, geographical, or scope-of-activity limitations."). While Georgia's definition of trade secrets is somewhat narrower than Texas's, the parties have not contested that any particular information constitutes a trade secret. The heart of the dispute seems to be that the Compensation Plan governed

argument is unpersuasive. After acquiring and merging with Century, Worldpay became successor and assign to Century's agreements, including the Proprietary Information Agreement that Ms. Haydon signed. The defendants have not produced a later agreement that Ms. Haydon executed. The defendants allege that another agreement, the Senior Vice President, NCR Merchant Solutions Fiscal Year 2016 Compensation Plan, and its Georgia choice-of-law clause actually govern Ms. Haydon's employment, arguing that even if the agreement was unsigned, Ms. Haydon accepted the agreement based on her conduct. Defs.' Reply MSJ at 3, ECF No. 155. The agreement, however, specifically states that it is not valid unless signed: "Eligibility also requires that each participant sign and submit the Plan acknowledgement form at the end of this document." Compensation Plan Ex. 1 at 4, ECF No. 138. Neither party has produced evidence that Ms. Haydon ever signed the agreement, and the fact that other employees' contracts were governed by Georgia law does not change the analysis here. Ms. Haydon agreed to be bound by Texas law in executing the Proprietary Information Agreement, and the parties have produced no evidence that she or Worldpay ever sought to alter that agreement. And even if the Compensation Plan constitutes an enforceable agreement, it does not purport to supersede or abrogate the Proprietary Information Agreement, but only "previously issued compensation plans and/or oral compensation agreements." *See id.* at 3. Worldpay's contract claims are therefore to be analyzed under Texas law.

As for the law applicable to the plaintiff's tort theories, Illinois choice-of-law rules mandate a two-part analysis for tort-based claims when a contractual relationship exists between the parties: the court must examine "the breadth and language of the choice-of-law provision to determine

---

by Georgia law contains no confidentiality or nonsolicitation provisions related to proprietary information, with the exception of asserting that the Plan itself is confidential and contains proprietary information. *See* Compensation Plan Ex. 1 at 8, ECF No. 138.

whether the parties intended the choice-of-law clause to govern all claims between them," and determine whether the tort claims are dependent on the contract. If so, the tort claims are subject to the choice-of-law clause regardless of its breadth. *Facility Wizard Software, Inc. v. Southeastern Tech. Servs., LLC*, 647 F. Supp. 2d 938, 943 (N.D. Ill. 2009). Looking first at the language of the contract, the Proprietary Information Agreement is clear that it "does not purport to set forth all the terms of my employment, and as an employee of the Company I have obligations which are not set forth in this Agreement." Proprietary Information Agreement at 1, ECF No. 119-2. In determining whether the tort claims are dependent upon the contract, the question is "whether the action alleges a wrong based upon interpretation and construction of the contract, or whether the claim alleges elements constituting an independent tort." *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 862 (N.D. Ill. 2002). Courts have held tortious interference with prospective economic advantage is independent of choice-of-law clauses and subject to the forum's choice-of-law rules. *See id.* at 863 (citing *Labor Ready, Inc., v. Williams Staffing, LLC,* 149 F. Supp. 2d 398, 409 (N.D. Ill. 2001)). The tort claims at issue here—tortious interference with employment contracts and tortious interference with business expectancy—do not depend on Ms. Haydon's Proprietary Information Agreement with Worldpay, but constitute independent torts. Accordingly, the Texas choice-of-law provision does not apply, and the Court must apply Illinois's choice-of-law rules as to those claims. *See id.* at 862-63 (citing *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.,* 64 F.3d 1112, 1114 (7th Cir. 1995)).

Illinois applies the "most significant relationship" test to determine which jurisdiction's substantive law governs tort claims such as tortious interference. Under this test, the court must consider: (1) the place of injury; (2) the place of the tortious conduct; (3) the domicile of the parties; and (4) the place where the relationship between the parties is centered. *Fredrick v. Simmons*

*Airlines, Inc.,* 144 F.3d 500, 504 (7th Cir. 1998). The "law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." *Id.* Worldpay's state of incorporation and principal place of business is Georgia, and the economic impact of tortious interference would be most heavily felt in Georgia. *See Garot Anderson Agencies, Inc. v. Blue Cross & Blue Shield United of Wis.,* No. 88-CV-20265, 1993 WL 78756, at *18 (N.D. Ill. Feb. 26, 1993) ("[W]here the injury is loss of customers or trade, the injury occurs at the place of loss . . . but it is most keenly felt at the principal place of business."). The parties have not provided sufficient information for the court to assess the other factors of the most significant relationship test. The most important factor, the place of injury, weighs in favor of Georgia. *See St. Charles Riverfront Station, Inc. v. Empress Casino Joliet Corp.,* 5 F. Supp. 2d 592, 594 (N.D. Ill. 1998) (applying the law of the place of injury despite other factors weighing in favor of another jurisdiction). The parties have also briefed the tort claims according to Georgia law. Accordingly, the court will apply Georgia law to Worldpay's tortious interference claims.

Georgia law also governs Worldpay's breach of fiduciary duty claim. *See Prime Leasing, Inc. v. Kendig,* 332 Ill. App. 3d 300, 314 n.1, 773 N.E.2d 84, 96 n.1 (Ill. App. Ct. 2002) ("Pursuant to Illinois choice-of-law principles, the fiduciary duty claims are governed by the law of the state of incorporation."). Because Worldpay is a Georgia corporation, DSOF ¶ 1, Georgia law applies.

As to the trade secrets claims, Worldpay seeks relief under the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.*, and the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/1 *et seq.* ("ITSA"). The defendants assert that the Georgia Trade Secrets Act, O.C.G.A. § 10-1-761, should apply rather than ITSA based on the Compensation Plan's Georgia choice-of-law clause. As discussed above, however, the defendants have not shown that the Compensation Plan governed Ms. Haydon's employment. Worldpay also points out that Ms. Haydon's duty not

to misappropriate trade secrets is independent of any contract she signed, that she was an Illinois resident at all times relevant to this action, and that the defendants have not made and therefore have waived a "significant contacts" argument as to why Georgia law should apply. Pl.'s Resp. Defs.' MSJ at 7-8, ECF No. 143. The Court agrees. Accordingly, the state law trade secrets claim shall be governed by ITSA.

## III. Contract Claims

Worldpay alleges that Haydon breached the Proprietary Information Agreement by misappropriating confidential information (Count III) and by soliciting Worldpay customers (Count VI). Worldpay has moved for summary judgment on the former claim, and the defendants have moved for summary judgment on the latter. Under Texas law, the "essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009). The defendants contest the validity of the Proprietary Information Agreement under Georgia law, but have not made any argument against it under Texas law. Texas courts have upheld similar agreements that prohibit the use of proprietary information in competition with the employer. *See, e.g.*, *McGowan & Co. v. Bogan*, 93 F. Supp. 3d 624, 636 (S.D. Tex. 2015) (finding that a non-compete agreement "limited to trade secrets, confidential information, and proprietary information . . . complies with Texas law and does not violate a fundamental public policy of Texas regarding non-compete covenants," even without geographic or time limitations). The Court finds that the Proprietary Information Agreement is valid and enforceable under Texas law. It is undisputed that "Worldpay performed under the contract by entrusting Haydon with Proprietary Information during her employment and providing her with significant compensation and bonuses." Mem. Supp. Pl.'s MSJ at 9, ECF No. 131.

The Agreement defines Proprietary Information as:

> any and all confidential or proprietary information including, without limitation: (i) technical information of the Company, its affiliates, its customers or other third parties, including computer programs, software, databases, know-how, formulas, compositions, processes, discoveries, machines, inventions, designs, developmental or experimental work, improvements, original works of authorship, training programs and procedures, diagrams, charts, and similar items; (ii) business information of the Company, its affiliates, its customers or other third parties, including business plans, compensation data, sales data, customer lists and information, supplier lists, prices and costs, credit information, financial data, information regarding the skills and compensation of employees and contractors of the Company, and similar terms, (iii) information relating to future plans of the Company, its affiliates, its customers or other third parties, including marketing strategies, sales plans, pending projects and proposals, research and development efforts and strategies, and similar items; (iv) other valuable, confidential information and trade secrets of the Company, its affiliates, its customers or other third parties and (v) this Agreement.

PSOF ¶ 7. Under the Agreement, Ms. Haydon was forbidden from disclosing proprietary information to any third party or using proprietary information for the benefit of anyone other than Worldpay, including "use of Proprietary Information to solicit any of the Company's former, current or prospective clients, or to solicit or encourage any other entity to solicit for employment any other employee of the Company or its affiliates." *Id.* ¶ 6. Ms. Haydon also agreed that "[d]uring my employment with the Company, I will not engage in any other activities that conflict with my obligations to the Company." *Id.* ¶ 8.

Worldpay argues in Count III that Ms. Haydon breached the Proprietary Information Agreement by misappropriating confidential information. In particular, Worldpay avers that Ms. Haydon referred to specific Worldpay customers at the March 30, 2017 meeting in Fairview, Texas to induce Worldpay employees to join Eunyt. The defendants dispute that claim, Defs.' Resp. PSOF ¶ 52, and argue that "Plaintiff offers no evidence that Ms. Haydon used any confidential

information; it simply asks the court to assume wrongdoing,"[8] Defs.' Resp. Pl.'s MSJ at 4, ECF No. 139. The transcript of the Fairview meeting, however, shows that Ms. Haydon specifically referred to numerous Worldpay customers who she believed were underserved and, seemingly, would be good targets for Eunyt's efforts, including at least the following:

| | |
|---|---|
| TX Meeting Tr. 1 at 20:11-25, ECF No. 152 | Ms. Haydon: "it's unbelievable to me in how major meetings I've been in be it that it was with [Company A] before we took the portfolio, and that we're now at [Company B]. We've been at meetings with [Company C], at meetings with companies that have an amazing idea, an amazing product . . . look at [Company D] . . . they know there's money to be made in payments, but it's just sitting there stalling, doing nothing because there's nobody exploding the market, and building the relationships that are going to be giving them the results that they really would probably like to see payments." |
| TX Meeting Tr. 2 at 35:13-18, ECF No. 152 | Male #4 (regarding a document being viewed and discussed during the meeting): "That takes you to a conservative estimate because what you don't have there is [Company E] . . . Remember, [Company F] they don't get any spiffs. There's a couple hundred [Company G] and a couple hundred [Company E]." |
| TX Meeting Tr. 2 at 38:7-9 | Male #1: "So you're saying we can produce customized statements for [Company H]?"<br>Ms. Haydon: "Yes; we will." |
| TX Meeting Tr. 2 at 45:13-20 | Male #4: "so Worldpay right now has, other than [Company I], they've got [Company J], I think they still have them; they may have lost it . . . They used to have a big relationship with [Company K]" |
| TX Meeting Tr. 2 at 83:6-19 | Ms. Haydon: "Then we have [Company L], for example; they're a lost child right now. They're still watching Lost. So ten million dollars of processing. They've already – they've (inaudible) a thousand customers that are now running on Worldpay's platform. The ten million dollars of processing is (inaudible) to take it." |

---

[8] The defendants also argue that circumstantial evidence is improper to show misuse of confidential information under Georgia law. As previously discussed, Texas law governs the breach of contract claim, and Texas law permits using circumstantial evidence. *See, e.g.*, *Morrison v. Profanchik*, No. 05-17-01281-CV, 2019 WL 3798182, at *4 n.7 (Tex. App. Aug. 13, 2019) (citing *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993)) ("This opinion should not be construed to require direct evidence that a party is misusing confidential information or trade secrets. These facts, like all other types of facts, can be proved with circumstantial evidence.").

| Eunyt Handout, Ex. 20a, ECF No. 119-3. | "As a start: Go after the 38,000 active [Company M] customers, the 20,000 deactivated" |
|---|---|

In addition, Worldpay alleges that one of the Worldpay clients whom Ms. Haydon referenced at the meeting "required Worldpay to execute a Non-Disclosure Agreement prior to exploring a potential relationship with Worldpay." Decl. Danielle Gourley ¶ 25, ECF No. 119-6. These examples convincingly demonstrate that Ms. Haydon used her knowledge of Worldpay's "customer lists and information," which are confidential information protected by the Proprietary Information Agreement, in identifying customers for her new business to target.

Worldpay also asserts that at the Fairview meeting, Ms. Haydon referred to attempting to recruit Bette Solis, a former Century representative who worked for Worldpay at the time, and "her 800 customers" to Eunyt. The defendants argue that this was not said at the meeting and, indeed, the transcript does say "inaudible" in the pertinent part. *See* TX Meeting Tr. 2, at 41:6-17, ECF No. 152. Worldpay's interpretation, however, is consistent with the testimony of Mr. McFarlane, who was present at and recorded the meeting and testified that Ms. Haydon did refer to Ms. Solis, Aff. Delroy McFarlane ¶ 14, ECF No. 119-5, as well as with the record evidence showing that Ms. Haydon emailed Ms. Solis an offer to work for Eunyt "behind the scenes" while continuing to work for Worldpay, Pl.'s Resp. DSOF App'x Ex. A, ECF No. 144-1. The defendants have not offered any affirmative evidence to the contrary. This information comprises proprietary business information of Worldpay, customer information, or "information regarding the skills and compensation of employees and contractors of the Company," and is also among the information subject to the provisions of the Proprietary Information Agreement.

The record also shows that a handout circulated at the Fairview meeting listed Worldpay as a "primary competitor" of Eunyt and that the attendees received a "New Hire Acknowledgement" for Eunyt at the meeting. In addition, Worldpay fired most of the attendees of

the meeting for their involvement with Eunyt[9] and pleads the amount of their salaries—more than $1.7 million in 2016—as well as the cost of the investigation and the intangible damage to its reputation, as damages.[10] Mem. Supp. Pl.'s MSJ at 11-12, ECF No. 131. While Worldpay has not placed the amount of its damages beyond dispute (pleadings do not constitute evidence in evaluating a summary judgment motion), it has shown that it suffered losses as a result of Ms. Haydon's breach. Worldpay's motion for summary judgment on its breach of contract claim for misappropriation of confidential information will therefore be granted as to Ms. Haydon's liability.[11]

---

[9] Worldpay terminated the attendees of the Fairview meeting except for Mr. Martin and Mr. McFarlane, who reported his concerns about Ms. Haydon's activities with Eunyt to Worldpay CEO Kim Goodman. Aff. Delroy McFarlane ¶ 20, ECF No. 119-5.

[10] Worldpay has not sought summary judgment as to damages and the Court intends no comment on the viability of its damages allegations.

[11] As to the other possible grounds for this claim, disputes of material fact remain. While the record shows that Ms. Haydon sent various Worldpay documents to her personal email account, it does not show if or how she used proprietary information in those documents for the benefit of anyone other than Worldpay. While sending these emails was likely a breach of Worldpay's Mobile Device Policy, it is not clear that this was a breach of the Proprietary Information Agreement. Similarly, while the evidence suggests that Ms. Haydon was prepared to "swap out [Worldpay] logos for EUNYT when ready" on Worldpay marketing materials, PSOF ¶ 32, there is no evidence that these marketing materials were ever circulated, and the defendants further assert that these materials referred to FINSYNC rather than Worldpay and would not have constituted proprietary information in the first place, Defs.' Reply MSJ at 11, ECF No. 155. Next, while Ms. Haydon did ask Mr. Standish to copy her Worldpay email, as further discussed below, the record does not show if or how she used any of this information for the benefit of anyone other than Worldpay. The record does show that Mr. Standish placed the email backup on Eunyt's server of his own accord and that Ms. Haydon did not ask him to do so. Standish Dep. ¶¶ 22, 25 29, ECF No. 119-7. Indeed, her communications indicate that she wanted to keep her Worldpay email "completely separate" from the Eunyt server, DSOF Ex. 12, ECF No. 125-8, and the only other person with access to these emails, Eunyt employee Hila Shpigelman, testified that she never viewed them. Shpigelman Dep. ¶ 35, ECF No. 125-4. As to Mr. McFarlane, to the extent Worldpay refers to text messages Ms. Haydon sent soliciting him to leave Worldpay, the record does not show that she used any proprietary information that would constitute a breach of the Agreement. *See* Aff. Delroy McFarlane ¶¶ 4-5, ECF No. 119-5. Worldpay's claim for tortious interference with Mr. McFarlane's employment contract is discussed below. Finally, significant disputes of material fact remain as to whether Ms. Haydon breached her contract in arranging for Mr. Mandel to receive a bonus on the condition that he give her half; the Court is unable to say as a matter of

Worldpay also alleges, as Count VI, that Ms. Haydon breached the Proprietary Information Agreement by soliciting Worldpay clients, including redirecting a potential business partner from Worldpay to Eunyt. The defendants, but not Worldpay, have moved for summary judgment with respect to this breach of contract claim, arguing that Worldpay has not adduced evidence sufficient to support a jury verdict in its favor, but significant disputes of material fact remain. While the record indicates that Ms. Haydon was in contact with potential clients for Eunyt while she was employed with Worldpay, as further discussed below, the record does not show that she used proprietary information to solicit these clients. To the extent that Worldpay refers to CEB Sales in its allegation that Ms. Haydon redirected a potential business partner from Worldpay to Eunyt, PSOF ¶ 33, the defendants argue that CEB Sales was a general consulting firm, rather than a sales client, and could have worked with both Worldpay and Eunyt without posing a conflict. Defs.' Resp. PSOF ¶ 33. Similarly, the defendants state that they contacted Worldpay client Zuzapp in a vendor capacity, not as a potential client. DSOF ¶¶ 14-15.

Accordingly, summary judgment is granted for Worldpay as to liability on the breach of contract claim for misappropriating confidential information, and summary judgment is denied with respect to whether Ms. Haydon breached her contract by soliciting Worldpay customers.

## IV. Tortious Interference Claims

The defendants have moved for summary judgment denying Worldpay's claims that Ms. Haydon tortiously interfered with existing employee contracts and with Worldpay's business expectancy.

---

law that Ms. Haydon wrongfully altered Mandel's sales targets for her own benefit rather than for some permissible purpose. Whether her arrangement with Mr. Mandel constitutes a breach of fiduciary duty is discussed below. Accordingly, the Court does not find a basis for summary judgment on these claims.

> Tortious interference claims, whether asserting interference with contractual relations, business relations, or potential business relations, share certain common essential elements: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Disaster Servs., Inc. v. ERC P'ship*, 228 Ga. App. 739, 740, 492 S.E.2d 526, 528 (Ga. Ct. App. 1997).

### A.    Interference with Existing Contracts

Despite its heading ("Tortious Interference with Existing Client Contracts"), Count IV of the complaint targets not existing "client contracts" but existing employment contracts in the form of nondisclosure agreements between Worldpay and a number of its employees. The record shows that these Worldpay employees were at-will but had signed nondisclosure or proprietary information agreements with Worldpay. Specifically, Worldpay alleges that Ms. Haydon "directed Standish and Benjamin to provide her with Confidential Information and thereby induced them to breach their Employment Agreements," Compl. ¶ 113, that she directed a number of Worldpay employees, namely Frank Fantuazzo, Tyler Nowell, Sam Martin, Delroy McFarlane, William Luyk, Jeffrey Sanders, and Randy Standish, to join her at a meeting in Fairview, Texas on March 30, 2017 "where they were informed of Haydon's scheme for creating her own ISO to compete with Worldpay by luring NCR and other customers away from Worldpay," *id.* ¶¶ 54, 114, and that at the meeting Ms. Haydon "solicited the attendees to leave their employment with Worldpay in order to work for Eunyt," *id.* ¶ 58.

### 1.    Randy Standish

Prior to his termination in May 2017, Randy Standish was an IT manager for Worldpay. Eunyt employee Hila Shpigelman asked Mr. Standish for help setting up a web domain and email

accounts for Eunyt in early 2017. Pl.'s Resp. DSOF ¶¶ 11-12. Mr. Standish attended the Fairview meeting in late March. PSOF ¶ 21. At that time, Ms. Haydon asked Mr. Standish to make a copy of her Worldpay email account. *Id.* ¶ 25. "Standish told McFarlane that he intended to 'do it under the grid' to avoid Worldpay becoming aware that he was copying Haydon's emails." *Id.*

Mr. Standish opted to migrate Ms. Haydon's Worldpay emails to a Eunyt email address. *Id.* ¶ 27. He avers that Ms. Haydon did not ask him to do so, but he "chose to upload to [Eunyt] as an easy solution." Standish Dep. ¶¶ 22, 25, 29, ECF No. 119-7. On April 6, 2017, Mr. Standish wrote from his Eunyt email address to Ms. Haydon's Eunyt email address: "I 'secretly' started the migration of your WP emails on Monday. This has now been completed and everything is in a separate eunyt email box with login information below. You have all the emails up to April 3rd, 2017. You had over 20gbs of data/emails to transfer, which took awhile to complete. At the time of your termination with WP, I can get the remaining emails after that date if needed." PSOF ¶ 27. The record indicates that Ms. Haydon and Eunyt paid Mr. Standish for copying Ms. Haydon's emails, as well as for setting up the Eunyt domain and email accounts, setting up laptops for Ms. Shpigelman and Mr. Bott, and other IT work. *Id.* ¶ 29; Haydon Dep. Ex. 17, ECF No. 119-3.

Mr. Standish had executed a Nondisclosure Agreement with Worldpay that included a provision that: "Employee agrees, except as specifically required in the performance of Employee's duties for Worldpay, that Employee will not, during the course of Employee's employment by Worldpay and for so long thereafter as the pertinent information or documentation remain Trade Secrets, directly or indirectly use, disclose, furnish, transmit, send or disseminate to any other person, organization or entity or otherwise employ any Trade Secrets." Standish Nondisclosure Agreement at 2, ECF No. 119-6. By asking Mr. Standish to copy her Worldpay emails and paying him to do so, Worldpay argues, Ms. Haydon induced him to breach his

19

nondisclosure agreement with Worldpay. Worldpay alleges that Ms. Haydon sent a number of emails containing trade secrets from her Worldpay email to her personal email in February, March, and early April 2017. PSOF ¶ 31. These messages would ostensibly have been captured in Mr. Standish's backup of her Worldpay email placed on the Eunyt server.

The first element in a tortious interference claim requires that the plaintiff "must show more than the defendant simply persuaded a person to break a contract . . . Indeed, the plaintiff must adduce evidence of 'improper action or wrongful conduct,'" such as "physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." *Kirkland v. Tamplin*, 285 Ga. App. 241, 244, 645 S.E.2d 653, 656 (Ga. Ct. App. 2007). While "[m]alice supporting a claim for tortious interference may be shown by evidence that the defendant persuaded someone to break a contract for the defendant's benefit and at the expense of another," *Fine v. Commc'n Trends, Inc.*, 305 Ga. App. 298, 308, 699 S.E.2d 623, 633 (Ga. Ct. App. 2010), it is not clear that persuasion and payment are sufficient to show that the defendants employed improper action or wrongful conduct to induce Mr. Standish to breach his nondisclosure agreement.

Here, while there is evidence to support the view that Mr. Standish breached his nondisclosure agreement, Worldpay has not adduced any evidence that Ms. Haydon used wrongful means to induce Mr. Standish to do so. The undisputed evidence indicates that she asked him to make a backup of her email and he agreed, placing the backup on the Eunyt server on his own initiative. To be sure, the record shows that Eunyt had hired Mr. Standish as of April 1, 2017 "on a month to month basis for IT setup and support," Haydon Dep. Ex. 22 at 4, ECF No. 119-3, "up to 60 hours a month . . . for $2,500 fixed," Haydon Dep. Ex. 17, ECF No. 119-3. For his initial work in March and April 2017, Eunyt paid Mr. Standish $2,000. *Id.* But offering someone a

position in a rival endeavor does not necessarily involve the use of wrongful means. What did Ms. Haydon do that was improper to convince Mr. Standish to breach his nondisclosure agreement? The answer cannot be: she used confidential information; that would conflate the means of inducing the breach by Mr. Standish with the object of inducement. While there was an element of secrecy to the proceedings and Mr. Standish may have breached his agreement with Worldpay, there is no evidence that Ms. Haydon tortiously induced him to breach his nondisclosure agreement. Summary judgment is therefore granted for the defendants as to Worldpay's tortious interference claim regarding Mr. Standish's nondisclosure agreement and his work copying Ms. Haydon's emails. That claim fails as a matter of law.

### 2. Alex Benjamin

Prior to his termination in May 2017, Alex Benjamin was a Worldpay employee in strategic partnerships. Upon Ms. Haydon's request, he allegedly emailed to her personal account a "pitch deck" for Worldpay customer Brigade Society in April 2017. Compl. ¶ 51. He reported to Ms. Haydon that he had spoken with representatives from Brigade, and they were "really open to partnering with Eunyt." He offered to connect Ms. Haydon to Brigade to discuss next steps. PSOF App'x Ex. E Attach. 7, ECF No. 119-6. In addition, Mr. Benjamin reached out to CozyPOS to discuss a partnership with Eunyt, ECF No. 151.

To "prevail on a claim alleging tortious interference with contract, a plaintiff must establish the existence of a valid contract." *Atlanta Mkt. Ctr. Mgmt., Co. v. McLane*, 269 Ga. 604, 608, 503 S.E.2d 278, 282 (Ga. 1998). Neither party has presented any contractual agreement signed by Mr. Benjamin; even if he were bound by the standard Worldpay confidentiality agreement, it is not clear from the information presented that the pitch deck that he allegedly forwarded to Ms. Haydon contained confidential information that would be protected by the agreement, nor is there any

evidence that he used confidential information to solicit CozyPOS. Accordingly, summary judgment is granted for the defendants with respect to tortious interference with Mr. Benjamin's contract.

>        **3.      Fairview Meeting Attendees: Frank Fantuazzo, Tyler Nowell, Sam Martin, Delroy McFarlane, William Luyk, Jeffrey Sanders, and Randy Standish**

The Worldpay employees who attended the Fairview meeting were at-will employees who had nondisclosure, proprietary information, or similar agreements concerning confidentiality with Worldpay. Frank Fantuazzo, Delroy McFarlane, Sam Martin, Randy Standish, and William Luyk were bound by a four-page nondisclosure agreement with Worldpay; Sam Martin and Jeffrey Sanders had executed an eight-page proprietary information and inventions assignment agreement with Worldpay; and Tyler Nowell had executed a proprietary information and nondisclosure agreement with a predecessor to Worldpay for which Worldpay was successor and assign. *See* Nondisclosure Agreements, ECF No. 119-6. The four-page nondisclosure agreement provides that "except as specifically required in the performance of Employee's duties for Worldpay . . . Employee will not, during the course of Employee's employment with Worldpay and for so long thereafter as the pertinent information or documentation remain Trade Secrets, directly or indirectly use, disclose, furnish, transmit, send or disseminate to any other person, organization or entity or otherwise employ any Trade Secrets." *Id.* Mr. Nowell's proprietary information and nondisclosure agreement contained an agreement not disclose confidential information, including customer lists, not to solicit the company's employees (or authorize or assist in their solicitation) and not to "engage in any other employment, occupation, consulting, or other activity which is similar to the actual or demonstrably anticipated business of the Company, or which would otherwise conflict with my obligations to the Company." *Id.* Mr. Sanders' and Mr. Martin's nondisclosure agreements contained provisions agreeing not to disclose confidential information

to any third party or to use confidential information for the benefit of anyone other than Worldpay, as well as stating that: "During my employment with the Company, I will not engage in any other activities that conflict with my obligations to the Company" and "I will disclose to the Company any employment, consulting, or other service relationship I enter into during the period of time beginning on the date of this Agreement and ending on the date that is one year after the termination of my employment with the Company for any reason. Such disclosure shall be made within seven days of my entering into such employment, consulting, or other service relationship." *Id.*

Worldpay alleges that Ms. Haydon tortiously interfered with these employees' contracts by directing them to attend the Fairview meeting and soliciting them at the meeting to join Eunyt. Worldpay's claim is that Ms. Haydon tortiously induced these employees to breach their nondisclosure agreements with Worldpay; however, Ms. Haydon's goal appears to have been to recruit these employees to leave Worldpay for Eunyt, not to induce them to disclose Worldpay's confidential information. There is no evidence at all that Ms. Haydon was seeking to induce these Worldpay employees to cough up Worldpay information; she had access to that information herself.

Even setting aside this conceptual problem, for Ms. Haydon to have tortiously interfered with their employment contracts, Ms. Haydon would have had to use improper means to induce the breach, and the Fairview attendees would have had to breach, their contracts. With respect to directing the employees to attend the Fairview meeting, the record does not show that Ms. Haydon used improper means to induce the group to attend, even if any of the attendees breached their agreements by attending the meeting; where Ms. Haydon may have used improper means in directing Delroy McFarlane to attend, he did not breach his agreement. With respect to soliciting

these employees to join Eunyt, even though Ms. Haydon used improper means in using confidential information to solicit them, it does not appear that the employees actually breached their agreements with Worldpay. While their attendance at the meeting prompted Worldpay to fire them for disloyalty, that is a different proposition from stating that Ms. Hayton tortiously interfered with their contractual nondisclosure obligations: Ms. Haydon sought to induce these employees to leave Worldpay, not to breach their nondisclosure agreements. Accordingly, either for lack of wrongful means or lack of a breach of contract, Ms. Haydon did not tortiously interfere with the nondisclosure agreements of the Worldpay employees who attended the Fairview meeting.

### a)    *Directing Worldpay employees to attend Fairview meeting*

With respect to directing the employees to attend the Fairview meeting, it is not clear that Ms. Haydon used improper means including "predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." *Kirkland*, 285 Ga. App. at 244, 645 S.E.2d at 656. At most, the affidavit of Delroy McFarlane shows that Ms. Haydon paid for his plane ticket to Texas and that she told him that the meeting was for "team building." Aff. Delroy McFarlane ¶ 7, ECF No. 119-5. As discussed with respect to Mr. Standish, providing payment for Mr. McFarlane likely was not improper means, and even if it was a misrepresentation to tell Mr. McFarlane that the purpose of the meeting was "team building," there is no evidence that Mr. McFarlane breached his nondisclosure agreement in attending the meeting or in his participation—indeed, he was the one who reported Ms. Haydon and Eunyt to Worldpay—and accordingly the claim that Ms. Haydon tortiously interfered with his contract in directing him to attend the meeting must fail for lack of a breach of his nondisclosure agreement.

As to the other attendees, there is no evidence that Ms. Haydon employed any wrongful means in directing them to attend: Mr. McFarlane's affidavit indicates that he traveled to Texas

with Sam Martin, who was apparently aware of the purpose of the meeting, *id.*, and Worldpay has not adduced any affirmative evidence of other means, proper or improper, that Ms. Haydon used to induce the participants to attend the meeting. With respect to their participation at the meeting, Worldpay has also not adduced affirmative evidence that any of the attendees breached their nondisclosure agreements.[12] While Mr. McFarlane avers in his affidavit that Fantuazzo, Nowell, Martin, Luyk, Sanders, and Standish can be heard in the recording of the meeting, *id.* ¶ 10, the transcript of the meeting does not identify which of the employees said what, and Worldpay has not alleged that any of these particular attendees disclosed names of Worldpay clients or other confidential information at the Fairview meeting. In any event, even if these employees disclosed confidential information at the Fairview meeting in violation of their nondisclosure agreements, there is no evidence that Ms. Haydon used improper means to induce them to do so, as would be required to support a tortious interference claim.

*b)*      ***Soliciting Worldpay employees at Fairview meeting***

As to the solicitation of the Worldpay employees at the Fairview meeting, while Georgia recognizes the "privilege of fair competition" that permits solicitation of a competitor's employees, that privilege is lost "when wrongful means in the solicitation of employees are utilized . . . such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." *Am. Bldgs. Co. v. Pascoe Bldg. Sys., Inc.*, 260 Ga. 346, 348-49, 392 S.E.2d 860, 863 (Ga. 1990). As discussed above in the breach of contract section, the evidence indicates that Ms. Haydon used confidential information in soliciting

---

[12] While this line of inquiry begs the question of whether one can violate a nondisclosure agreement by disclosing information to those within the same company, brainstorming strategies for Eunyt's launch was clearly not "specifically required in the performance of Employee's duties for Worldpay" and, as such, discussion of Worldpay's client list or other confidential information may constitute a violation of the employees' nondisclosure agreements.

these employees to work for Eunyt, referring to specific Worldpay customers who she believed were underserved. Worldpay terminated Fantuazzo, Luyk, Nowell, Sanders, and Standish for their involvement in Eunyt and claims the amount invested in their salaries as damages, PSOF ¶¶ 61-65. The evidence is therefore sufficient to support a judgment that Haydon used wrongful means in seeking to recruit these employees.

But did these employees breach any agreement with Worldpay by agreeing, or planning, to sign up with Eunyt? The nondisclosure agreement signed by Mr. Fantuazzo, Mr. McFarlane, Mr. Luyk, and Mr. Standish does not contain any prohibition on competing with Worldpay or working for or with another entity. As to Mr. Fantuazzo, Mr. McFarlane, and Mr. Luyk, there is no evidence in the record that they breached their nondisclosure agreements with Worldpay, nor that Ms. Haydon wanted them to do so. While Mr. Standish likely breached his agreement in copying Ms. Haydon's email account, as discussed above, the record does not show that he disclosed any of Worldpay's trade secrets or otherwise breached his nondisclosure agreement in attending the Fairview meeting.

As to Mr. Nowell, Mr. Sanders, and Mr. Martin, though Ms. Haydon used wrongful means when she used confidential information to solicit them to join Eunyt, the record does not show that any of the three breached their agreements. While Mr. Nowell was listed as an anticipated Eunyt hire in preliminary documentation, *see* Haydon Dep. Ex. 20b, ECF No. 119-3, the record does not show that he was ever hired by Eunyt. Similarly, while Ms. Haydon's emails indicate that Mr. Sanders and Mr. Martin were anticipated Eunyt hires to be onboarded in April or May, *see* Haydon Dep. Ex. 22, ECF No. 119-3, Worldpay has not averred that either was actually employed by Eunyt or, if they did leave Worldpay for Eunyt, that they failed to inform Worldpay within seven days as required by their proprietary information agreements. Even construing the contract provision

26

forbidding engaging in activities that conflict with their obligations to Worldpay broadly, employees are permitted to prepare for post-employment competition without breaching any duty of good faith and loyalty to the employer. *See, e.g.*, *Nilan's Alley, Inc. v. Ginsburg*, 208 Ga. App. 145, 146, 430 S.E.2d 368, 370 (Ga. Ct. App. 1993). Worldpay's allegation is that Ms. Haydon used confidential information to solicit these employees to leave Worldpay, but as at-will employees, they were entitled to leave the company for any reason or for no reason at all, and the record does not indicate that they breached their obligations to Worldpay as memorialized in their nondisclosure or proprietary information agreements, nor that Ms. Haydon's goal in soliciting them to work for Eunyt was to have them breach their agreements. As such, summary judgment is granted for the defendants on the tortious interference with existing employment contracts claim.

## B.     Interference with Business Expectancy

Worldpay's claim for tortious interference with business expectancy (Count V), focuses on the defendants' alleged poaching of business from Worldpay clients. "To support a verdict for tortious interference with business relations the evidence must show the defendant '(1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury.'" *Arford v. Blalock,* 199 Ga. App. 434, 440, 405 S.E.2d 698, 704 (Ga. Ct. App. 1991), *aff'd sub nom. Wilensky v. Blalock,* 262 Ga. 95, 414 S.E.2d 1 (Ga. 1992). In this case, though the evidence shows that Ms. Haydon and Eunyt solicited customers like Brigade and CozyPOS while she was still employed with Worldpay, the evidence has not shown that they kept Worldpay from any expected business relationship or otherwise caused Worldpay financial injury. Worldpay has not shown any reasonable expectation of working with Brigade or CozyPOS, and the defendants assert that certain partners to whom they reached out, like CEB Sales and Zuzapp, were vendors who could have

worked with both Worldpay and Eunyt without creating any conflict or loss. In short, there is no evidence that Worldpay lost any business opportunities to the defendants and, accordingly, summary judgment is granted to the defendants with respect to Worldpay's tortious interference with business expectancy claim.[13]

## V.      Breach of Fiduciary Duty Claim

In Count VII, Worldpay asserts that Haydon breached fiduciary duties she owed to Worldpay. Worldpay asserts multiple bases for its breach of fiduciary duty claim against Ms. Haydon, including that she accessed and transmitted Worldpay's confidential information for her own use, solicited clients and partners on behalf of Eunyt, solicited Worldpay employees to work for Eunyt, conditioned Mr. Mandel's bonus on his agreement to give her half of the bonus, and "misappropriat[ed] Worldpay's funds by seeking reimbursement for expenses used for a Eunyt meeting and executing plans to compete during work time." Pl.'s Resp. Defs.' MSJ at 11, ECF No. 143; Compl. ¶¶ 133-36. As noted, because Worldpay is a Georgia corporation, Georgia law applies to Worldpay's breach of fiduciary duty claim. A claim for breach of fiduciary duty in Georgia "requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *Griffin v. Fowler*, 260 Ga. App. 443, 445, 579 S.E.2d 848, 850 (Ga. Ct. App. 2003).

---

[13] Worldpay argues that because the Eunyt domain was shut down, defendants "should not be able to rely on this absence of evidence to support their motion." Pl.'s Resp. Defs.' MSJ at 13-14, ECF No. 143. That argument effectively repeats Worldpay's request for a spoliation sanction that penalizes the defendants for the loss of the emails Ms. Haydon (with the assistance of Mr. Standish) copied to the Eunyt email server. The Court denied Worldpay's motion for spoliation sanctions, however—see ECF No. 109—and for the same reasons declines here to relieve Worldpay of its affirmative obligation to adduce evidence sufficient to create a jury issue as to lost business opportunities.

As an initial matter, the parties dispute whether Ms. Haydon owed a fiduciary duty to Worldpay. Under O.C.G.A. § 10-6-1, the "relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another on his behalf." Ms. Haydon owed a fiduciary duty to Worldpay during the period of her employment to the extent that she was "vested with authority, real or ostensible, to create obligations on behalf of [her] principal, bringing third parties into contractual relations with [her]." *See Physician Specialists in Anesthesia, P.C. v. Wildmon*, 238 Ga. App. 730, 732, 521 S.E.2d 358, 360 (Ga. Ct. App. 1999). The undisputed evidence shows that Ms. Haydon was "the entrusted leader for the [NCR] channel" with responsibility for "nurturing the relationship between NCR and Worldpay." PSOF ¶ 14. Ms. Haydon could create obligations on Worldpay's behalf by approving sales contracts, albeit within specified guidelines, and for most accounts, she was the final authority on approval. Haydon Dep. at 77:11-20, ECF No. 119-3; *cf. Sitton v. Print Direction, Inc.,* 312 Ga. App. 365, 372, 718 S.E.2d 532, 539 (Ga. Ct. App. 2011) (finding fiduciary duty when employee had authority to solicit business on employer's behalf and to bind employer for certain obligations). Further, and despite defendants' contention that Ms. Haydon did not owe Worldpay a fiduciary duty, in her counterclaim Ms. Haydon herself asserts that "Ms. Haydon and her team of Worldpay employees were given authority to bind Plaintiff and NCR through sales contracts." Counterclaim ¶ 8, ECF No. 60. To the extent Worldpay authorized Ms. Haydon to act on its behalf, she was Worldpay's agent, and an agent has a fiduciary duty to her principal. *Hanson Staple Co. v. Eckelberry*, 297 Ga. App. 356, 358, 677 S.E.2d 321, 323 (Ga. Ct. App. 2009).

The defendants argue that even if Ms. Haydon owed Worldpay a fiduciary duty with respect to certain client relationships, fiduciary duties are domain-specific, and she did not owe broader duties to Worldpay with respect to either its confidential data or to its relationships with

its employees. Defs.' Reply MSJ at 7, ECF No. 155. The defendants also argue that any claim for breach of fiduciary duty by accessing and transmitting confidential information is preempted by the Georgia Trade Secrets Act. Mem. Supp. Defs.' MSJ at 8, ECF No. 124-1. Even assuming that Ms. Haydon had a fiduciary duty to Worldpay only with respect to certain sales and customer relationships, however, there is evidence in the record to support a breach of this more narrow fiduciary duty because it creates a fact question as to whether Ms. Haydon was competing with Worldpay before she left the company.

As a general matter, an "employee breaches no fiduciary duty to the employer simply by making plans to enter a competing business while he is still employed. Even before the termination of his agency, he is entitled to make arrangements to compete and upon termination of employment immediately compete." *Instrument Repair Serv., Inc. v. Gunby*, 238 Ga. App. 138, 140, 518 S.E.2d 161, 163 (Ga. Ct. App. 1999). An employee is not, however, "entitled to solicit customers for a rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business." *Id.* The record suggests that Ms. Haydon engaged in active solicitation of business for Eunyt while she was still employed at Worldpay. On April 11, 2017, Ms. Haydon asked fellow Worldpay employee Alex Benjamin to send a pitch deck for Brigade to her personal email account. Compl. ¶ 51. Mr. Benjamin said that he had spoken with Brigade and that they were "really open to partnering with Eunyt." He asked for Ms. Haydon's availability the following day "for me to connect you with the guys for an intro and discuss next steps etc." PSOF App'x Ex. E Attach. 7, ECF No. 119-6. Mr. Benjamin also sent a pitch deck for CozyPOS, a prospective client, to Ms. Haydon's Eunyt email address on April 17, 2017, ECF No. 151. The defendants argue that there is no evidence that either of these entities were potential customers or partners of Worldpay, Defs.' Resp. Pl.'s Statement Add'l Facts ¶ 8, ECF No. 156,

but that argument has more to do with a claim that Ms. Haydon misappropriated a business opportunity from Worldpay. Here, by contrast, the breach is that she actively solicited business for a competing enterprise, Eunyt, while employed with Worldpay. *See Keg Techs., Inc. v. Laimer*, 436 F. Supp. 2d 1364, 1376 (N.D. Ga. 2006) (finding a breach of fiduciary duty when employee "began, not simply *planning* to compete with the employer, but engaging in the active solicitation of business for his competing enterprise"). Whether or not these entities had a relationship with Worldpay is not the issue; the question is whether in seeking to do business with them, Haydon was effectively operating a competing business. Worldpay has shown that disputes of material fact remain as to that question and so defendants' motion for summary judgment on the breach of fiduciary duty claim is denied.

## VI.    Trade Secrets Claims

Worldpay alleges violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/1 *et seq.*, for actual and threatened misappropriation of Worldpay's trade secrets. The defendants have moved for summary judgment on these claims. Trade secrets are misappropriated when obtained through "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," 18 U.S.C. § 1839(6); 765 Ill. Comp. Stat. 1065/2(a), or when used "without express or implied consent." 18 U.S.C. § 1839(5); 765 Ill. Comp. Stat. 1065/2(b)(2). The defendants' motion challenges only the adequacy of the evidence to support a jury finding as to improper acquisition and use without consent; their motion does not address whether particular information satisfies the criteria for treatment as "trade secret" information.

As to improper acquisition, Worldpay alleges that Ms. Haydon forwarded Worldpay documents containing trade secrets to her personal email account and that Mr. Standish placed a backup of her Worldpay email account, also containing trade secrets, on the Eunyt server. The

defendants maintain that Mr. Standish was not instructed to place the backup on the Eunyt server and that his action was a "quickly-remedied misunderstanding, not the misappropriation of Plaintiff's information." Mem. Supp. Defs.' MSJ at 11, ECF No. 124-1. That is an argument for a jury, however; there is sufficient basis in the record to support a determination, by a preponderance of the evidence, that the defendants sought to misappropriate trade secret information by copying it and migrating it to accounts that the defendants controlled.

As for use without consent, the defendants maintain again that it is "clear" that "Eunyt never used any confidential information," and that Ms. Haydon used information only in the scope of investigating fraud with the knowledge and consent of her supervisors. *Id.* The defendants' argument that there is no evidence that Eunyt, rather than Ms. Haydon, misappropriated confidential information is subject to dispute, however. The argument rests on the premise that Ms. Haydon obtained the Worldpay information to further her Rate Lock Guarantee investigation. As Worldpay points out, however, there is evidence that Ms. Haydon's misappropriation dated from February 2017, and her mass migration of emails was completed on April 6, 2017, a week before she claims to have become aware of the allegedly fraudulent rate increases on April 12. *See* Pl.'s Resp. Defs.' MSJ at 9, ECF No. 143 ("Haydon specifically pled that she did not become aware of the alleged fraud until April 12, 2017"); *see also* Counterclaim ¶¶ 24-25, ECF No. 60 ("Ms. Haydon had not known about the rate increases prior to April 12, 2017"). Moreover, whether couched in terms of a principal-agent or alter ego relationship, there is ample evidence in the record to support a finding that in obtaining this information from Worldpay, Ms. Haydon was acting to establish and operate Eunyt. Accordingly, the defendants' motion for summary judgment on the trade secret claims is denied.

## VII.    Counterclaims

Ms. Haydon counterclaims against Worldpay under the False Claims Act, 31 U.S.C. § 3730(h) and the Sarbanes-Oxley Act, 18 U.S.C. § 1514(A)(a)(1). According to Ms. Haydon, her discharge from Worldpay was only pretextually related to Eunyt. Rather, she alleges that she was terminated because she had discovered that Worldpay had violated its "Rate Lock Guarantee" to clients, including governmental entities and federal contractors. Worldpay seeks summary judgment on these claims, pointing to the absence of evidence that the alleged rate increases affected government clients and disputing that it had written agreements with these government clients regarding rate change increases.

### A.    False Claims Act

To support a retaliation claim against Worldpay under the FCA, Ms. Haydon would have to show that (1) her actions were taken "in furtherance of" an FCA enforcement action and so were protected by the statute; (2) Worldpay knew that she was engaged in this protected conduct; and (3) her discharge was motivated, at least in part, by the protected conduct. *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002). The statute "covers investigations that, though reasonable in prospect, do not pan out and thus do not lead to actions under the False Claims Act" but "limits coverage to situations in which litigation could be filed legitimately—that is, consistently with Fed. R. Civ. P. 11." *Lang v. Northwestern Univ.*, 472 F.3d 493, 494 (7th Cir. 2006). An employee "who just imagines fraud but lacks proof, legitimately may be sacked." *Id.* at 495. The threshold question in evaluating an FCA claim is whether an employee "had a reasonable objective basis" for her belief that the employer was engaging in fraud. *Id.*

Here, Ms. Haydon has not presented a reasonable objective basis for her claim that Worldpay was defrauding government clients. As Worldpay points out, her claim has changed over the course of this litigation: "originally she suggested that Worldpay raised rates without

notice to customers when interchange rates did not increase and she now alleges that the rates were increased more than the interchange rate." Pl.'s Reply MSJ at 15 n.4, ECF No. 153. *Compare* Counterclaim ¶ 19, ECF No. 60 ("The interchange rates had not increased for the relevant customers."), *with* Defs.' Resp. Pl.'s MSJ at 7, ECF No. 139 ("Ms. Haydon and her team discovered that Plaintiff was increasing rates beyond interchange increases.") While in most cases, that a theory may evolve as discovery progresses is not problematic, here the relevant theory is not what Ms. Haydon now believes or asserts, but what she asserted before she was terminated; if there was no objective basis for that belief at that time—that rates were being raised even though interchange rates were not—then her assertions did not constitute protected activity. That Ms. Haydon has changed her story, however, does not necessarily mean that her original assertions were objectively unreasonable, and here the original story is sufficiently similar to the modified version that the evolution itself does not warrant the conclusion that Ms. Haydon's original claims were objectively unreasonable.

But, as Worldpay also notes, there is no evidence to support Ms. Haydon's claim that Worldpay was defrauding (or planning to defraud) the federal government by increasing processing fees in excess of increases in the interchange fee. Though there are allegations to that effect in the counterclaims, Ms. Haydon has adduced no evidence to support those claims. Her defense of the adequacy of evidence adduced to support her retaliation claim does not refer at all to government clients. *See* Defs.' Resp. Pl.'s MSJ at 7, ECF No. 139. Her statements of material facts and responses to plaintiff's statements of material facts do not point to such evidence. More generally, Ms. Haydon fails to point to any evidence that she was sounding an alarm about fraudulent conduct generally. She maintains that she "investigated potential fraudulent activity, with the full knowledge and support of some of her supervisors," Defs.' Statement Add'l Facts

34

¶ 88, ECF No. 140, but the two exhibits cited in support of that claim show only that Ms. Haydon was very concerned about potentially losing clients as a result of a price increase; neither says a word about any concern about fraud, *see* Exs. 10-11, ECF No. 138. And her deposition testimony indicates that while she and Christopher Hollins, President of Worldpay's Small Business Unit, were concerned about the possibility that governmental clients would be charged the increase, she described only one such client—a "government pharmacy school." Haydon Dep. 153:1-22, ECF No. 119-3. Moreover, she asserted that the point of her effort with Mr. Hollins was to prevent an overcharge. *Id.* 152:9-12 ("I was trying to stop it, to be honest with you. I wanted to—I thought it—at that time, there was still an opportunity to stop the increase."). She acknowledged that she did not know whether the school had in fact been overcharged. *See id.* 153:25–154:5 ("[I] honestly don't know if they officially did or didn't. I never got to find out."). In other words, the sole evidence Haydon relies on to support her claim that she was fired for reporting a fraud on the government is that she had identified a single government client that had been given a rate lock guarantee; that with the help of her boss she had tried to prevent that overcharge; and that she does not know whether there ever was an overcharge. That is not an objective reasonable basis for a belief that Worldpay violated, or intended to violate, the FCA.

Though Ms. Haydon avers that the reason she sent Worldpay documents to her personal email in early 2017 was in service of her fraud investigation, she has not indicated how any of those materials gave rise to the inference that fraud was occurring, and she began doing so before she allegedly became aware of the rate increase in April 2017. While Ms. Haydon protests that she was fired "just two days after complaining that her supervisors had ceased cooperating with her investigation," Defs.' Resp. Pl.'s MSJ at 8, ECF No. 139, "timing evidence, by itself, is rarely sufficient to create a jury question." *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 561 (7th Cir.

2011). The timing inference is particularly weak here, where the events to which Worldpay points (Mr. McFarlane's report to Ms. Goodman about the Fairview meeting) were occurring simultaneously. Ms. Haydon has not shown that her conduct was in furtherance of an action under the FCA, even one that did not pan out, nor that Worldpay's decision to fire her was connected to her alleged protected conduct.

### B.      Sarbanes-Oxley Act

Under SOX, employees are protected from retaliation for providing information or assisting in an investigation related to six enumerated categories of fraud: mail fraud, wire fraud, bank fraud, securities fraud, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders. 18 U.S.C. § 1514(A)(a)(1). To bring a SOX counterclaim, Ms. Haydon has the initial burden of showing the prima facie elements of a retaliation claim, that "(1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009). Once the plaintiff meets this initial burden, the defendant employer must show "by clear and convincing evidence that it would have taken the same unfavorable action in the absence of that protected behavior." *Id.* An employee must subjectively believe that the employer was acting unlawfully, and that belief must be objectively reasonable. *Id.*

As with her FCA claim, Ms. Haydon has not shown that she believed that Worldpay was acting unlawfully, only that she was concerned about losing clients and commissions. She has adduced no evidence of contracts including a rate lock guarantee. She has acknowledged that interchange rates did go up. She admits that clients were told that their rates would be increased as of May 1. She has not pointed to evidence that shows that rates were increased beyond what

36

could be justified by the "rate lock guarantee." She has, in short, not adduced evidence of fraud and so has failed to show that her putative investigation falls under one of the six enumerated categories of fraud to be considered protected activity under SOX. Moreover, Worldpay could show by clear and convincing evidence that it would have terminated Ms. Haydon notwithstanding any putative protected activity for her involvement with Eunyt and for "insubordination" in refusing to attend a meeting with upper-level management as requested.[14] *See* Haydon Dep. 133:3-18, ECF No. 119-3. Accordingly, the Court grants summary judgment for Worldpay and against Ms. Haydon on her FCA and SOX counterclaims.

## VIII.  Motion for Attorney's Fees

Finally, counsel for Worldpay bring a motion for attorney's fees related to their motion to compel discovery. In granting the motion to compel, this Court ruled that "Worldpay is entitled to an award of attorney's fees. Worldpay may recover costs and attorney's fees involved in preparing and presenting its initial Motion to Compel Discovery." Mem. Op. & Order at 5, ECF No. 109. Plaintiff's counsel seeks $41,080 in fees for the work of three attorneys on the motion. The defendants dispute both that plaintiff's counsel's rates are reasonable and that the amount of time spent preparing and presenting the motion is reasonable, asserting that $2,592.05 is the proper award amount. Defs.' Resp. Pl.'s Mot. Atty's Fees at 7, ECF No. 112.

---

[14] Worldpay further points out that it also terminated the other employees who were involved with Eunyt (but were not part of Ms. Haydon's communications to upper-level management about the rate increase), demonstrating that the terminations were the product of the effort to establish a competing company rather than in retaliation for sounding an alarm about fraudulent activity. The defendants argue that the "other terminated employees were Ms. Haydon's most trusted employees, and they were not part of her investigation," Defs.' Resp. Pl.'s MSJ at 8, ECF No. 139. Other than Ms. Haydon's deposition testimony, however, the defendants do not adduce any evidence to support that point, and Ms. Haydon's testimony is inadequate to counter the point as it refers only to "her team" and to Christopher Hollins, rather than to any specific employees who were involved with Eunyt.

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate." *People Who Care v. Rockford Bd. of Educ.*, 90 F.3d 1307, 1310 (7th Cir. 1996). "Once an attorney provides evidence of his billing rate, the burden is upon the defendant to present evidence establishing 'a good reason why a lower rate is essential' . . . A defendant's failure to do so is essentially a concession that the attorney's billing rate is reasonable and should be awarded." *Id.* at 1313 (citing *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1151 (7th Cir. 1993)).

Plaintiff's counsel have submitted declarations regarding their hourly rates: Gregory Andrews charges $531.00, Tracie Mauer charges $463.50, and Sabreena El-Amin charges $292.50. Each avers that their "rate is consistent with the hourly rates charged for comparable work by attorneys in the Chicago, Illinois area." *See, e.g.*, Decl. Gregory H. Andrews ¶ 9, ECF No. 111-1. The defendants argue that "Plaintiff offered only the unsupported affidavits of its attorneys, with no market information" and cite to a recent civil rights case, *Bellamy v. City of Chicago*, No. 15-CV-02678, 2017 WL 3675729 (N.D. Ill. Aug. 25, 2017), in support of lower hourly rates that they would find to be more appropriate. Defs.' Resp. Pl.'s Mot. Atty's Fees at 3-4, ECF No. 112. The Seventh Circuit has held, however, that a court should look to "the next best evidence—the rate charged by lawyers in the community of 'reasonably comparable skill, experience, and reputation'" only when it is unable to determine the attorney's true billing rate, for example if the attorney "maintains a contingent fee or public interest practice." *People Who Care*, 90 F.3d at 1310 (citing *Blum v. Stenson*, 465 U.S. 886, 892, 895 n.11 (1984)). Because counsel have provided evidence of their actual billing rates and the defendants have not provided

any information regarding the applicable market rates of attorneys trying trade secrets cases in the Chicago area,[15] the Court finds that plaintiff's counsel's rates are presumptively appropriate and the defendants have not adequately rebutted that presumption. Accordingly, the Court will apply plaintiff's counsel's billing rates as set forth in their declarations to determine their reasonable fee.

Plaintiff's counsel must also show that their hours spent were reasonable and were related to the initial motion to compel. Each attorney has submitted their time entries as part of their motion for attorney's fees. The motion to compel was filed on March 9, 2018 and was noticed for presentment on March 14. The plaintiff amended the motion to include sealed exhibits on March 22, 2018. The motion was presented on March 27, 2018 and was continued for status hearings on April 10 and May 15, 2018. On November 14, 2018, the Court granted the plaintiff the opportunity to "recover costs and attorney's fees specifically related to the preparation and initial presentment of its Motion to Compel Discovery." Accordingly, while plaintiffs' counsel presents time entries through August 24, 2018, the Court focuses on those in the period leading up to the presentment of the motion on March 27, 2018.

Within this narrower time period, plaintiff's counsel seeks attorney's fees for tasks not specifically related to the preparation and presentment of the initial motion to compel discovery; many of these tasks, such as reviewing defendants' document production, would have been completed regardless of any motion to compel. For each of the three attorneys, the Court adopts

---

[15] Even with information about the going market rate for comparable work, plaintiff's counsel here has provided evidence of their actual billing rates, and a "judge who departs from this presumptive rate must have some reason other than the ability to identify a different average rate in the community . . . lawyers who fetch above-average rates are presumptively entitled to them, rather than to some rate devised by the court." *Gusman*, 986 F.2d at 1150-51.

their stated hours, billed at their normal hourly rates, where the task is directly related to the preparation and presentment of the initial motion to compel discovery.[16]

As to Mr. Andrews, the Court awards 6.8 hours at $531.00, for a total of $3,610.80 for his work revising the motion to compel and attending the hearings on the motion to compel on March 14 and 27. As to Ms. Maurer, however, the Court declines to include her twenty minutes of time reviewing the motion, as that brief involvement was likely unnecessary to the filing of the motion. Similarly, the Court declines to include the time that Ms. El-Amin billed for attending the hearings; two lawyers at the hearings were not necessary, as is evident from the fact that Ms. El-Amin was present for only a portion of the time. Otherwise, however, Ms. El-Amin's time is recoverable. Deducting these amounts yields 12.4 hours at $292.50 for a total of $3,627.00 for Ms. El-Amin's work preparing and revising the motion to compel and the exhibits.[17] In total, plaintiff's counsel are entitled to $7,237.80 in fees with respect to the motion to compel discovery.

\* \* \* \* \*

For the reasons stated above, Worldpay's partial motion for summary judgment is granted. Defendants' motion for summary judgment is granted in part and denied in part. Judgment in favor of Worldpay will be granted on the breach of contract claim relating to misappropriation of

---

[16] In addition to contesting which tasks are reasonably related to the motion to compel, the defendants also argue that "20 hours for a motion to compel is excessive." Defs.' Resp. Pl.'s Mot. Atty's Fees at 5, ECF No. 112. Not all motions to compel are created equal, however, and this one fell to the more complicated end of the spectrum. Here, the Court cannot say as a matter of law that the amount of time spent is too great, particularly when plaintiff's counsel had to contend with ascertaining discovery deficiencies, over-designation, delayed responses to discovery requests, numerous exhibits, and changing defense counsel.

[17] For Mr. Andrews: revise motion to compel discovery, 2.4 hours; revise motion to compel, 1.8 hours; attend hearing on motion to compel, 1.1 hours; and attend court on motion to compel, 1.5 hours. For Ms. El-Amin: develop strategy for motion to compel, 0.2 hours; draft motion to compel, 0.8 hours; prepare motion to compel, 3.1 hours; prepare motion to compel and exhibits, 4 hours; revise motion to compel, 3.8 hours; revise motion to compel, 0.2 hours; and file motion to compel with sealed exhibits, 0.3 hours.

confidential information and as to the retaliation counterclaims. Judgement in favor of the defendants will be granted on the tortious interference with employment contracts and business expectancy claims. Remaining for resolution by a jury, or settlement by the parties, are the trade secrets claims (Counts I and II), the breach of contract claim relating to the solicitation of clients (Count VI), and the breach of fiduciary duty claim (Count VII). The motion for attorney's fees is granted in the amount of $7,237.80.

Date: June 8, 2020

John J. Tharp, Jr.
United States District Judge